# Exhibit A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 24-_____**

IN RE APPLICATION OF
DEPARTMENT OF HOMELAND
SECURITY, IMMIGRATION AND
CUSTOMS ENFORCEMENT,

Petitioner

v.

Christopher Calmore SHAND,
Axxx xxx 257

Respondent                                      /

### DECLARATION OF ASSISTANT FIELD OFFICE DIRECTOR CHARLES PARRA, KROME SERVICE PROCESSING CENTER

I, Charles Parra, make the following statements under oath and subject to the penalty of perjury pursuant to the provision of 28 U.S.C. § 1746.

1.      I am currently employed as an Assistant Field Office Director (AFOD) with U.S. Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO).  I am assigned to the Krome Service Processing Center (Krome), located in Miami, Florida.  At Krome, I manage ERO personnel and provide oversight of ICE operations in the facility. In December of 2002, I began my Federal Government career with the Department of Justice, Legacy Immigration and Naturalization Service. In March of 2003, my position was transferred to DHS, U.S. Customs and Border Protection. In April of 2007, I entered on duty with DHS, ICE, ERO.

2.      As an AFOD, I am responsible for the supervision and oversight of ERO operations, including detention and removal of noncitizens at Krome.

3.      ICE is committed to ensuring that every person detained in its custody receives timely access to necessary and appropriate medical, dental, and mental health care and treatment while in custody.  The health, safety, and welfare of all persons detained in its custody are among the agency's highest priorities, and ICE has protocols in place to ensure that any individual on a hunger strike within its detention facilities is promptly and appropriately addressed and treated, and that the safety, security, and order of the facility is maintained for the detainees, staff, contractors, volunteers, and visitors therein.

4.      The Respondent, Christopher SHAND, (hereinafter SHAND) is a native and citizen of Jamaica and is presently detained at Krome, pending appeal of the immigration judge's decision to the Board of Immigration Appeals.

5.      As of November 23, 2024, SHAND missed nine consecutive meals and was officially listed as being on a hunger strike by medical personnel at Buffalo Federal Detention Facility, in New York.  While detained in New York, SHAND initially stated he was striking because detention officials were not accommodating his request for a Rastafarian diet, but later alleged that his intent in engaging in a hunger strike is to protest his continued detention. Despite reasonable accommodation of his requested diet, to include plant-based nutritional supplements, SHAND continued to refuse all forms of nutrition.  On December 28, 2024, SHAND was transferred to Jena, Louisiana, pending transfer to Krome, where he continued his hunger strike. On January 4, 2025, SHAND was transferred to Krome for continuity of care, in light of his ongoing hunger strike.

6.      SHAND previously initiated a hunger strike in June 2024 and July 2024 after he refused to eat meals because of his religious dietary restrictions.  These strikes ended when he consumed food and drinks in sufficient quantity that medical personnel discontinued hunger strike protocols.

7.      Since SHAND began his hunger strike in November 2024, staff have attempted to convince him to end the hunger strike and begin eating food and consuming adequate water.  It has been explained to SHAND that, if he continues the hunger strike, his health will be seriously jeopardized, and he may eventually die.  Despite repeated efforts to convince him to eat and drink adequate fluids, SHAND has failed to cooperate and expressed his commitment to continue the hunger strike.

8.      At Krome, SHAND has been offered a diet which accommodates his religious beliefs.  However, the medical staff has advised me that SHAND still refuses to consume sufficient food and liquids to ensure his continued health and prevent bodily harm.  ERO staff have informed SHAND that if he continues his hunger strike it may become necessary to seek a court order to involuntarily examine him, test him, and if necessary, involuntarily administer food or hydration to save his life.

9.      In addition to ICE's paramount concerns about the health and wellbeing of ICE detainees, the death or injury of any detainee as a result of a hunger strike would also seriously affect the operations of ICE at Krome and adversely affect ICE efforts to maintain the safety, security, and good order of the detention facility for the detainees, staff, contractors, volunteers, and visitors therein in the following ways:

a.      My foremost obligation is to maintain the safety and security of the ICE detainees housed at the facility and provide for the health and well-being of the detainees, which includes protection from self-harm.  A facility cannot stand by and fail to intervene

3

in self-injurious behavior that is completely antithetical to our mission of maintaining the health and safety of noncitizens under our care.

b. Moreover, other detained noncitizens may engage in hunger strikes, whether or not with the intention of committing suicide by starving themselves to death. For a detained noncitizen to cause his own death without staff intervention would completely undermine DHS's obligation to render appropriate medical care and prevent detainee suicides.

c. In addition to critical personal health and safety for each individual, general security and order in the facility can also be destabilized by hunger strikes, which risks harm to other persons in the facility, including detainees, staff, contractors, volunteers, and visitors. Perceptions may be formed by the ICE detained population that ICE will simply let a detainee die, without intervening to save him or her, which could lead to lowered morale, resentment, acts of detainee violence and disruptions. The detained population, having formed such a perception, could act alone or in groups to disrupt the operation of the facility. I am concerned that hunger strikes, and even other acts of a disruptive or violent nature, would be directed at staff and other providers, to express detainee anger, resentment, and frustration.

d. If such disruptive acts were to occur, tensions between detained noncitizens and staff would be heightened, making almost all aspects of the detention operation more difficult for staff to perform.

e. Other detained noncitizens may decide that they have lost confidence in the skills, ability, or willingness of medical staff at the facility to administer medical care. They may be reluctant to seek treatment from the medical staff, reluctant to accept the treatments recommended, and may decide there is a need to "second guess" the judgments of the medical staff. They may simply refrain from seeking treatment for their illnesses from the medical staff, leading to emergency situations that could have been avoided had the detainee sought medical help at an earlier time.

f. Detained noncitizens who participate in hunger strikes may severely and permanently damage their health. This may also require immediate and long-term medical care which in turn may require DHS to unnecessarily divert and expend its limited resources when such action can be avoided with appropriate medical intervention.

g. In the absence of an adequate response to life-threatening hunger strikes, other detained noncitizens may participate in such activities in an attempt to change facility operations or exact concessions from facility management, rather than using other available means that do not threaten their health and wellbeing. For example, detained noncitizens may initiate hunger strikes to pressure staff to transfer them away from the facility, or to gain their release from detention. Without the ability to intervene when medically necessary, the facility will be forced to choose between letting the detained noncitizen die and giving in to their demands. ICE supports detained noncitizens' ability to express

concerns about their cases, and an array of options – short of life-threatening hunger strikes – is available to them, including:

    i    Pursuit of applications for relief and protection from removal in proceedings before a neutral immigration judge;

    ii    Submission of facility-specific informal and formal grievances (including emergency grievance processes and appeal processes) relating to any aspect of their detention, including medical care, which trigger prompt responses;

    iii    Submission of the online ERO Contact Form on the detainees' behalf by stakeholders, including interested individuals, nongovernmental organizations, faith-based organizations, and advocacy groups;[1]

    iv    Complaints to oversight entities within the Department of Homeland Security, including the Office of Inspector General, Office for Civil Rights and Civil Liberties, Office of Detention Ombudsman, as well as the ICE Office of Professional Responsibility; and

    v    Use of the Detention Reporting and Information Line, a toll-free service that provides a direct channel for detainees, family members, private attorneys, and other stakeholders to communicate directly with ICE ERO about detainee allegations and concerns.

h.      Some detained noncitizens may merely voice threats to go on a hunger strike, diverting additional staff attention away from other detainees.

i.      If a detained noncitizen is permitted to die from self-starvation, public perception of DHS and its staff will be adversely affected. Members of the community expect that DHS will use its best efforts to preserve the lives of detained noncitizens while enforcing the immigration laws of the United States.

10.    For the reasons stated above, to allow SHAND to continue to refuse to eat would harm ICE's ability to protect detained noncitizens from self-harm and suicide, and operate Krome in a safe, secure and orderly manner. This petition for involuntarily medical monitoring is required to prevent imminent bodily harm and/or death caused by SHAND's continued hunger strike.

---

[1] This form is available at: https://www.ice.gov/webform/ero-contact-form.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this __15th__ day of January, 2025.

CHARLES A PARRA
Digitally signed by CHARLES A PARRA
Date: 2025.01.15 14:59:11 -05'00'

Charles Parra
Assistant Field Office Director
U.S. Department of Homeland Security
U.S. Immigration and Customs Enforcement
Krome Service Processing Center

6