# Exhibit B

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 25-_____**

IN RE APPLICATION OF
DEPARTMENT OF HOMELAND
SECURITY, IMMIGRATION AND
CUSTOMS ENFORCEMENT,

Petitioner

v.

Christopher Calmore SHAND,
Axxx-xxx-257

Respondent _____ /

## DECLARATION OF MANUEL E LOPEZ DIAZ, M.D.

I, Manuel E Lopez Diaz, make the following statements under oath and subject to the penalty of perjury pursuant to the provision of 28 U.S.C. § 1746.

1.      I am a licensed, Board-Certified Emergency Medicine physician assigned to the Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), ICE Health Service Corps (IHSC) as the Staff Physician at the Krome Service Processing Center. I have held this position since March 26, 2023. I have 28 years of experience as an emergency medicine physician working for critical access hospitals to Level I trauma centers.

2.      As the Staff Physician at the Krome Service Processing Center, my duties include providing medical care for detainees at the facility. This declaration is made in support of the Petition filed by DHS/ICE to perform involuntary physical examinations, periodic laboratory tests (blood and urine), daily vital signs with weight, intravenous hydration, and if required by laboratory results, involuntary nutrition for Mr. Christopher Shand ("Mr.

1

Shand" or "the patient"), who is detained at Krome.  I am the treating physician of Mr. Shand, and I make this declaration upon a review of his medical record and my examination and treatment of him.

3.      ICE is committed to ensuring that every person detained in its custody receives timely access to necessary and appropriate medical, dental, and mental health care and treatment while in custody.  The health, safety, and welfare of those detained in its custody are among agency's highest priorities, and IHSC has protocols in place to ensure that any patient on a hunger strike within its detention facilities is promptly and appropriately addressed and treated.

4.      The patient is a native of Jamaica.  He arrived at Krome on January 4, 2025, after transfer from New York, for continuity of care in light of his ongoing hunger strike.  The patient's hunger strike began in New York on November 23, 2024.

5.      Mr. Shand states that he is on a hunger strike to protest his continued detention and because he does not believe that the diet provided for him by detention staff appropriately accommodated his religious beliefs as a Rastafarian.  He is on day 54 of his hunger strike and has missed 165 meals as of breakfast this morning.  He has had periods in which he has consumed no water or food since he initiated his hunger strike while being detained in New York, and while in transit to Krome.  When Mr. Shand first began his hunger strike in New York, he refused to allow medical staff to weigh him.

6.      Significantly, since his transfer to Krome's medical clinic on January 4, 2025, Mr. Shand initially refused to be weighed or permit physical examination.  He refuses to allow blood draws for laboratory testing. Mr. Shand also refused to drink water or consume nutritional drinks such as Boost, despite being offered a plant-based nutritional supplement

2

and a vegan or vegetarian diet with fish to accommodate his religious beliefs

7.      On January 10, 2025, January 13, 2025, and January 14, 2025, and January 15, 2025, Mr. Shand consumed his dinner meals.

8.      On January 13, 2025, Mr. Shand allowed medical staff to weigh him.  His weight was recorded as 137.8 lbs., reflecting a loss of 18.2 lbs. or 11.67% of his initial body weight. Transfer records dated January 4, 2025 indicate that Mr. Shand's weight prior to the initiation of his strike was 156 lbs.

9.      On January 15, 2025, Mr. Shand allowed a partial physical examination.  His hand grip and chest auscultation were normal.  He refused to be weighed or permit blood draws for laboratory testing.

10.     On January 16, 2025, Mr. Shand drank two coffees and one container of plant based-nutritional supplement (330ml) at breakfast.

11.     I asked Mr. Shand if he planned to eat one meal a day, and he refused to answer.  I also asked Mr. Shand if he would allow laboratory testing, and he refused to answer. I have counseled Mr. Shand that his consumption of a single meal per day, two coffees and a single container of plant-based nutritional supplement are insufficient to prevent imminent bodily harm or death, should he continue his strike, in light of the prolonged length of his strike, 54 days and 165 missed meals.

12.     Mr. Shand continues to refuse to consume food or drink in sufficient amounts to prevent injury or death to himself should he continue not to eat or drink.  In addition, he continues to refuse to allow a full physical examination, vital signs, urinalysis or blood draws for laboratory testing.  He continues to refuse to be weighed, with one exception on January 14, 2025.

13. The patient has been evaluated by a psychiatrist and displays no evidence of a psychiatric condition that would cause him not to eat or drink. He appears to be operating under his own free will.

14. Mr. Shand has been counseled by medical staff on the effects of self-imposed dehydration and starvation on his body. He has also been informed of the involuntary hydration and nutrition procedures that will be pursued by way of court order to prevent injury and/or death to himself should he continue not to eat.

15. Mr. Shand remains in custody at Krome and under medical observation. His lack of cooperation with medical staff at Krome since his admission to Krome's clinic on January 4, 2025, has prevented any objective evaluation of his clinical and metabolic status. Since Mr. Shand refuses to submit to laboratory testing, there is no laboratory data available to monitor renal function or electrolyte disturbances which could be potentially fatal.

16. It is for this reason that I am requesting a court order for involuntary physical examinations, periodic laboratory tests (blood and urine), daily vital signs with weight, intravenous hydration, and involuntary nutrition by way of nasogastric tube or parenteral means.

17. Laboratory tests are needed to evaluate the metabolic state to include electrolytes and kidney function. The laboratory tests that need to be obtained during a hunger strike include:

    a. Complete metabolic panel. This test reveals an increase in markers of kidney function in view of any renal injury. The panel tests blood urea nitrogen (BUN) creatinine level and proteins. It also reveals electrolyte disturbances that can lead to heart arrhythmias such as potassium, phosphate, magnesium and glucose levels.

    b. Complete blood count. This test reveals the hemoglobin level.

    c. Urinalysis, which reveals the presence of ketones, blood and crystals in the urine.

d.      Thiamine levels to assess deficiency at day 14 of a hunger strike.

e.      Electrocardiogram, if the patient shows elevated potassium, which can lead to arrhythmias.

f.      Creatinine phosphokinase (CPK), which is an enzyme found inside muscle cells and is released into the blood when the muscle cells rupture. The increase in CPK can lead to rhabdomyolysis, a breakdown of muscle tissue that can fatally damage other vital organs.

g.      Prealbumin, used as a marker for nutritional status evaluation. Prealbumin will decrease over time the longer a patient fails to consume adequate nutrition, and the prealbumin level correlates with patient morbidity and mortality risk. Normal prealbumin is 15-35 mg/dL. When prealbumin falls to 5-11mg/dL, significant morbidity risks exist, and aggressive nutritional support is necessary.

18.     It is difficult to predict for how long the human body can survive without food; if an individual does not have adequate fat stores, this time decreases significantly. If an individual goes without water for approximately eight to ten days, he will suffer from dementia and delirium seizures and ultimately become unconscious. Dehydration greatly accelerates a progressive starvation because the waste that the body produces is not excreted. Death by terminal total fasting occurs by acute depletion of thiamine, causing fatal arrhythmia and/or cardiac arrest.

19.     Mr. Shand's condition is expected to decline as his hunger strike continues. Between the 15th and 30th day of a hunger strike, a patient may suffer neurological symptoms which are severe enough to warrant hospitalization. Mr. Shand is already exhibiting signs and symptoms of orthostatic blood pressure changes which are caused by dehydration and may cause dizziness. In addition, the patient has had a decreased urinary output, which is indicative of both dehydration and hypotension.

20.     Medical literature reflects that metabolic imbalance, caused by fasting, is likely to

5

result in permanent bodily damage and/or death once weight loss reaches 18% of the patient's initial weight.

21.    The medical staff has explained to Mr. Shand the medical necessity to eat to preserve his health and the medical risks of continuing his hunger strike. Other staff members have repeatedly talked to   the patient in attempts to convince him to eat solid foods, liquid or bland diets, and/or drink nutritional supplements.  However,  Mr. Shand has continued to refuse to eat solid food and/or drink nutritional supplements, with the exception of four dinner meals and one container of nutritional supplement

22.    I have personally explained to Mr. Shand my concerns regarding his condition and the medical risks involved with a continuing lack of sufficient nourishment, especially in view of the current duration of his strike. That is, he risks significant and ongoing metabolic changes induced by his decreased nutritional intake. If he continues his hunger strike, he will reach a state of severe metabolic imbalance, with a high risk of adverse consequences such as permanent damage to his kidneys, liver, heart failure and the risk of death. Mr. Shand stated to me that he would continue his hunger strike.

23.    In my professional medical judgment, if Mr. Shand continues his hunger strike, with the aggravating factor of inappropriate oral hydration, he will reach the point where he will require immediate  medical  intervention  to prevent further deterioration and serious medical complications.  Continued fasting will result in permanent damage to his internal organs and has the potential to become life threatening.  Metabolic imbalance, if left untreated, will cause fatal arrhythmia and/or cardiac arrest.  When medical intervention is required, it will be necessary to feed Mr. Shand a nutritional supplement through a nasogastric tube and/or intravenous line to provide him the nutrition he needs.  His present

dehydration status may also require intravenous fluid hydration to stabilize his blood pressure and ameliorate the signs and symptoms of postural hypotension.

24.     Also, it is necessary to perform laboratory tests and physical evaluation to monitor and assess his clinical condition.

25.     Mr. Shand's consumption of four dinner meals and meager fluid intake in the past six days does not provide sufficient calories to ameliorate the effects of his current strike. Based on Mr. Shand's current physical condition, and the fact that he has not had adequate nutritional intake for 54 days, nor had appropriate oral fluid intake, it is my informed medical opinion to a reasonable degree of medical certainty that involuntary intravenous hydration and nutrition are required at this time. His lack of nutritional intake compounded by his voluntary dehydration can drastically exacerbate the effects of his hunger strike.

26.     Involuntary hydration and feeding would be pursued only as necessary to prevent injury, further dehydration, malnourishment, organ failure, or loss of life due to his self-imposed hunger strike. Involuntary feeding would be accomplished through a nasogastric tube or intravenous (parenteral) means.

27.     The issuance of a court order to perform involuntary feedings and hydration, blood draws and all necessary physical examinations is medically necessary to preserve and sustain Mr. Shand's health, welfare, medical safety, and life.

28.     To ensure the patient's health, welfare, medical safety, preservation of life, should the patient refuse to cooperate with laboratory blood draws, involuntary hydration and/or involuntary nutrition, medical soft restraints will be required to immobilize the patient and prevent unnecessary injury to both the patient and medical staff.

7

I declare under penalty of perjury that the foregoing is true and correct.

Executed this __16th__ day of January, 2025.

Manuel E. Lopez Diaz, M.D.
Staff Physician

8